# HARRY BEBERMAN v. SOL FRISCH.
# SOL FRISCH v. HARRY BEBERMAN AND ANOTHER.[1]

April 9, 1954.

No. 36,141.

[1]Reported in 64 N. W. (2d) 132.

*Samuel Dolf* and *M. E. Culhane,* for appellant.
*Oscar A. Brecke* and *Manley H. Frisch,* for respondents.

KNUTSON, JUSTICE.

The facts in this case are somewhat complicated, but for the purposes of this decision the material facts may be stated as follows: On and prior to April 12, 1948, Harry Beberman was engaged in a foundry business. He then owned a foundry building, which we shall refer to as the old foundry, and had commenced building another, which we shall refer to as the new foundry. He was having financial difficulties, both in meeting his obligations and in completing the new building. On that date he owned a real estate mortgage on other property worth $3,000; machinery in the foundry building worth about $5,000, encumbered by a mortgage of about $2,500; the old foundry building, which was encumbered by a mortgage of $9,800; the new foundry, which was encumbered by a mortgage of about $10,000 which had been foreclosed and bid in at a sheriff's sale by Gerald and Dorothy Iverson, who held a sheriff's certificate for $10,199.48. The new foundry was also subject to a number of mechanic's liens. Beberman also was indebted to several personal creditors in various amounts aggregating about $1,000.

Sol Frisch was engaged in the business of selling plumbing and supplies under the name of National Plumbing Supply Company. He also was engaged in the business of handling bankrupt estates and surplus property and on some occasions advanced money for

the purpose of effecting settlements between creditors and debtors.

On April 12, 1948, Beberman and Frisch entered into a written agreement, which as far as here material reads as follows:

"This Agreement made and entered into this 12th day of April 1948 by and between Harry Beberman and Sol Frisch,

"Witnesseth:

"Whereas, said Beberman is the owner of certain properties in the city of Minneapolis, Hennepin County, Minnesota, one a completed building called the 'old foundry', and an uncompleted building called the 'new foundry', and is the mortgagee of a third property called the 'Washington Avenue property', and

"Whereas, the cost of construction on the new foundry has far exceeded the original estimates and Beberman is unable to make payment thereof, liens having been filed thereon by various claimants, and his interest therein is subject to said lien claims and a mortgage, but the priority between said liens and said mortgage is undetermined and said Frisch is willing to make the financial arrangements hereinafter contained upon the conditions expressed in this agreement,

"Now, therefore, it is agreed as follows:

"That Beberman shall execute quit claim deeds to the old foundry and the new foundry to said Frisch, which said properties are described respectively as follows:

"[Here follows a description of the property] and shall execute an assignment to said Frisch of the mortgage on the Washington Avenue property, which said mortgage is payable at the rate of One Hundred Dollars (100.00) per month including interest. Said property covered by said mortgage is described as follows:

"[Here follows a description of the property] and conveyances above mentioned and said assignment of said mortgage to be absolute in form but as security only for the amount of advance that said Frisch shall make upon Beberman's account for the following purposes:

"(a) To pay and satisfy the liens and mortgage on the new foundry and to complete construction thereof at the option of said Frisch.

"(b) For the amount advanced by Frisch for the payment of Beberman's personal creditors.

"(c) For the amount advanced by Frisch to purchase the existing encumbrances on the old foundry.

"II.

"It is agreed that the income and rents from the old foundry and payments on the mortgage on the Washington Avenue property shall be first used in payment of taxes and insurance on said properties and the balance credited against the indebtedness of Beberman for advances made under this agreement.

"III.

"Beberman agrees to repay Frisch the amount of the prior incumbrances upon the old foundry with interest at the present rate thereof and to repay Frisch the total face amount of the lien claims on the new foundry when Frisch shall have obtained the discharge of said liens and encumbrances; similarly, to pay Frisch a sum of money equal to the amount of the mortgage on the new foundry without interest, it being understood and agreed that Frisch, as compensation for his services, shall be entitled to receive and retain for his own account and as his own property any sums of money he can save or realize by negotiating favorable settlements of said liens and said mortgages.

"IV.

"Frisch, upon taking possession of said new foundry, agrees to execute a lease to Beberman for as long as Frisch retains possession thereof at a rental of Two Hundred Fifty Dollars ($250.00) per month, said sum, when and as paid by Frisch, to be applied by him upon Beberman's indebtedness to Frisch. It is contemplated in this connection that a partnership will be formed between Beberman and others for the purpose of operating said new foundry as a foundry for the manufacture of soil pipes and fittings and that Frisch will give Beberman and/or said partnership an order for the fabrication and casting of Two hundred (200) tons of soil pipes and fittings at a price consistent with the cost thereof, said price to include a reasonable profit to be mutually agreed upon, but which

cost shall not exceed an amount which will make the disposition of said soil pipes and fittings unprofitable in this locality.

"V.

"At the option of said Frisch, he or his nominee may be admitted as a partner in said enterprise for the casting of soil pipes and fittings referred to in the preceding paragraph.

"VI.

"It is contemplated that Frisch will make advances for the payment of the personal debts of Beberman as herein provided and that said advances, when and as made, shall be charged against Beberman's account with interest thereon at the rate of six per cent (6%) per annum from the date of payment. It is understood and agreed that if said bills are settled at a discount, Frisch shall be entitled to retain the amount of such discount, if any, as compensation for his services in connection therewith and he, Frisch, also shall be entitled to retain, as compensation for his services rendered pursuant to this agreement, any and all sums representing discounts or the differential between the amount paid and the face amount due on any said bills, liens, mortgages, or other encumbrances.

"VII.

"Frisch hereby agrees to reconvey said above described properties to said Beberman or his assigns upon repayment to Frisch of all money advanced plus his compensation for services as herein provided.

"VIII.

"Said Frisch further agrees not to sell any of said properties without the written consent of Beberman. However, said Frisch shall have the right to encumber said property if, in the opinion of Frisch, it becomes necessary so to do in order to carry out the purpose and intent of this agreement.

"In Witness Whereof, the parties hereto have hereunto set their hands the day and year first above written.

> "Harry Beberman
> "Sol Frisch"

Pursuant to this agreement, Beberman assigned to Frisch the $3,000 mortgage he owned and executed quit claim deeds to the property. Frisch paid the Iversons the amount they had coming on their sheriff's certificate but, instead of making a redemption, caused the sheriff's certificate to be assigned to his daughter, Hazel Tigerman. Instead of paying the mechanic's liens and procuring satisfactions thereof, he purchased them at a discount of about 25 percent and took assignments running either to his daughter, Hazel Tigerman, or his son, Arnold Frisch. The total amount of the liens so acquired amounted to $13,566.09. In completing the new foundry he paid out some $8,543.90. This was handled by having those who did the work or who furnished material file mechanic's liens; then he took assignments of these liens running to either his son or his daughter. Frisch paid personal debts of Beberman totaling $987.65 at various discounts. He also paid taxes and insurance on the property and some items of maintenance.

Instead of forming a partnership as the agreement provided, the parties organized a corporation under the name of Anchor Foundry Corporation. Sixty shares of the capital stock of this corporation were issued. Beberman received 15 shares, Frisch 15 shares, one Thomalla 15 shares, and one Herlofsky 15 shares. Anchor Foundry Corporation commenced doing business on June 1, 1948, and took over a lease on the new foundry, agreeing to pay $250 per month rent. In May 1949, one Flakne, acting for Frisch, secured a judgment against Beberman for $550.92 and levied on Beberman's shares in Anchor Foundry Corporation. These shares were sold to Frisch on execution sale, and thereafter Beberman had no further connection with Anchor Foundry Corporation as an owner. On January 1, 1949, Anchor ceased paying rent, and it ceased to operate the foundry in September. On April 8, 1950, Anchor filed a petition for voluntary bankruptcy and was adjudicated a bankrupt. Frisch, through his attorney, purchased the assets of Anchor, including machinery and equipment.

On February 27, 1950, Frisch, purporting to act for his daughter, Hazel Tigerman, entered into a contract for deed with Minnesota Iron Works, Inc., a corporation, for the sale of the new foundry for

$55,000. The contract called for an initial payment of $100 and payments of $400 to $500 per month over a long period of time. Minnesota Iron Works, Inc., understood that before the sale could be completed it was necessary to procure the consent of Beberman. Beberman never did consent. On June 3, 1950, Minnesota Iron Works, Inc., leased the premises for $200 per month. The trial court held that this lease acted as a cancellation or abandonment of the contract for deed. About January 1952, Minnesota Iron Works, Inc., was evicted from the property for nonpayment of rent.

In the meantime, on April 28, 1950, Beberman had commenced an action against Frisch in which he asked for a cancellation of the original agreement and for an accounting. Frisch counterclaimed in that action, asking for an accounting and for a sale of some of the real estate.

On November 4, 1950, Frisch commenced another action against Beberman and Hazel Tigerman in which he claimed to be the owner of an equitable mortgage against the property under the original agreement and asked for an accounting and that the property be sold in satisfaction of the amount he had coming. In this action Beberman counterclaimed and filed a cross-complaint against Hazel Tigerman. These cases thereafter were consolidated for trial and were referred to a referee for such trial. The findings of the referee have been adopted by the court. The court held that Frisch was a mortgagee in possession. It allowed him the following credits:

| | |
|---|---:|
| Amount advanced in discharge of Iverson mortgage and sheriff's certificate and liens on new foundry, | $24,220.39 |
| Amounts advanced in the completion of the new foundry, | 8,543.90 |
| Amounts advanced to pay personal debts, | 987.65 |
| Amounts advanced to pay encumbrances on old foundry, | 5,014.53 |
| Amounts advanced for maintenance of property, | 744.15 |
| Amounts paid for taxes and insurance, | 6,651.10 |
| | |
| Total credits allowed, | $46,161.72 |

The court found that Beberman was entitled to credits from Frisch amounting to $12,275, which included the $3,000 mortgage which

was reduced to cash and rents collected in the sum of $9,275, leaving a balance due Frisch of $33,886.72, to which was added a mortgage registration tax of $50.85, leaving a grand total due Frisch of $33,937.57.

Judgment was ordered against Beberman for that amount and interest. It was declared to be a lien on the property, subject to a prior mortgage on the old foundry. Hazel Tigerman was declared to have no right, title, or interest in or to any of the property. All of her interest in the property and that of the son of Frisch were reassigned to him and all liens were released. It was ordered that the mortgage be foreclosed in payment of this judgment. Judgment was entered, and this appeal is from such judgment.

While there are a number of assignments of error, the appeal presents for our determination the following questions: (1) Was Frisch a mortgagee in possession or a trustee? (2) Did the court err in allowing certain credits which will be discussed hereinafter? (3) Should the account of Frisch be surcharged for rental for the property when it was unoccupied? (4) Should Frisch be charged with the price for which the foundry was sold to Minnesota Iron Works, Inc., under the contract for deed? (5) Did the court err in refusing to grant appellant leave, after findings were made but before the entry of judgment, to file a supplemental complaint in which Beberman sought to have an accounting for the rents collected up to date?

There can be little doubt that, under the terms of the agreement entered into between Beberman and Frisch, the conveyance of the foundry property was intended as security for the advances to be made by Frisch. As such, it creates an equitable mortgage. Meighen v. King, 31 Minn. 115, 16 N. W. 702; Sanderson v. Engel, 182 Minn. 256, 234 N. W. 450; 4 Dunnell, Dig. & Supp. § 6150. Once it is determined to be a mortgage, it always remains a mortgage. Hill v. Edwards, 11 Minn. 5 (22).

While appellant does not question these rules of law, it apparently is his contention that Frisch should be held to be a trustee rather than a mortgagee in possession for the reason, as he sees it, that by

virtue of M. S. A. 559.17[2] the right to possession cannot be created or acquired in or by the mortgage instrument but must arise by virtue of a subsequent agreement. He relies principally upon Cullen v. Minnesota Loan & Trust Co. 60 Minn. 6, 61 N. W. 818, and the cases following the rule there announced. We apprehend, however, that appellant has failed to note the distinction between the right of a mortgagee under an executory mortgage to gain possession prior to the expiration of the period of redemption from foreclosure and the right of a mortgagee who has gone into possession with the assent of the mortgagor to remain in possession. This distinction is pointed out in Anderson v. Minnesota Loan & Trust Co. 68 Minn. 491, 71 N. W. 665, 819; Gandrud v. Hansen, 210 Minn. 125, 297 N. W. 730; and Lemon v. Dworsky, 210 Minn. 112, 297 N. W. 329. While the statute prevents a mortgagee from acquiring possession under an executory mortgage, it does not prevent the mortgagee from going into possession of the mortgaged property with the assent of the mortgagor. Once in possession, the mortgagee has the same right to remain in possession whether the agreement was made contemporaneously with or subsequent to the mortgage. See, 26 Minn. L. Rev. 885. The court's finding that Frisch was a mortgagee in possession is amply sustained by the evidence.

■ Out of the total amount allowed, objection is made to only a few rather small items. These will be briefly considered separately insofar as there is any merit to them at all.

(a) One Rudy Radmacher was employed in the completion of the new foundry. He furnished material and labor and thereafter filed a lien for $2,179.03. The court allowed Frisch $2,979.03 for payments made to Radmacher. The difference apparently represents additional items paid but not included in the lien. The evidence, while not as complete as it might have been, sustains the court's finding that the entire amount was paid in the completion of the building. It was properly allowed.

[2]"A mortgage of real property is not to be deemed a conveyance, so as to enable the owner of the mortgage to recover possession of the real property without a foreclosure."

(b) While Anchor Foundry Corporation was in possession of the building it purchased on a conditional sales contract, a steel shaft four stories high connected with a monorail running to the cupola. The equipment was essential to the operation of a foundry. Frisch had to guarantee payment of the equipment, and when Anchor failed to pay, he was compelled to pay $1,900 of the purchase price in order to retain the equipment. It is apparent from the agreement between the parties that Frisch was authorized to complete the new foundry so that it could be operated as a foundry. The equipment was firmly attached to a concrete foundation and remains in the building. The expenditure was authorized under the agreement and was properly allowed. The fact that the equipment was sold on a conditional sales contract is not conclusive. Many fixtures so sold become permanently attached to a building after purchase. Having in mind the purposes for which the new foundry was completed, the expenditure was necessary and obviously within the purview of the agreement.

(c) One of the claims involved a payment made to Rudy Radmacher for installing a shower room and construction of a concrete foundation for the steel shaft mentioned above. What we have said in the preceding paragraph applies to these two items. They were necessary expenditures and became part of the building.

(d) The Kvalsten Electric Company installed some heavy wire for use of power necessary to operate the foundry. This, too, became part of the building, and what we have said above applied to this item.

(e) The next item to which objection is interposed is a small item of $150 for installing two cast iron furnaces to heat the building. As near as we can determine, it is the claim of appellant that Frisch, as landlord, was not authorized to heat the building. We see no merit in this claim as to this item or any of the other items not specifically mentioned.

Appellant next contends that the court erred in failing to surcharge Frisch's account for loss of rental of the property while it was unoccupied. The evidence shows that Frisch did attempt to rent the property but was unable to do so. Appellant's argument is

based on the premise that Frisch was a trustee rather than a mortgagee in possession. Whatever the relationship of the parties, it was a question of fact whether Frisch exercised that degree of diligence required of him in keeping the property rented. The evidence supports the court's findings on this phase of the case.

■ The next point raised by appellant requires little discussion. As near as we can determine it, appellant claims that, when Frisch entered into a contract for deed with Minnesota Iron Works, Inc., he sold the property and should be held accountable for the alleged purchase price. The difficulty with appellant's position is that the sale was contingent upon procuring the consent of appellant. Appellant refused to co-operate, so Frisch and Minnesota Iron Works, Inc., abandoned the contract and entered into a lease in lieu thereof. The failure to consummate the sale was due to appellant's failure to consent to it. He cannot now take advantage of his own failure to do so. Here, again, appellant's argument is based on the assumption that Frisch was acting as a trustee. Even if he was, appellant could not make use of his own failure to consent to the sale to hold Frisch liable for the purchase price under a contract which never was really consummated because of the failure of appellant to co-operate.

■ After the trial was completed and before judgment was entered, appellant sought permission to file a supplemental complaint which would have permitted him to have an accounting for rents collected since the trial and up to the date thereof. The court denied his motion. He now assigns as error the court's refusal to permit him to file such complaint. The matter was within the discretion of the trial court. Undoubtedly appellant can have an accounting for such rents in a proper action brought subsequent to the entry of judgment.

We have carefully examined the entire record. While there were deviations from the contract on the part of both parties thereto, it appears that the trial court has arrived at as fair a result as possible under the circumstances existing. Apparently Frisch did proceed in such a way that he would be doubly protected. Possibly he

did things which were not contemplated by the contract. However, the liens of which he took assignments and the liens assigned to his son and daughter have now all been released. The properties conveyed to his son and daughter or assigned to them have all been reconveyed or reassigned to Frisch. We are convinced that the court carefully examined all items involved and disallowed those items which were not within the agreement entered into between the parties, having in mind the main purpose of the agreement. Substantial justice has been done between the parties, and the trial court's decision should be and is affirmed.

Affirmed.

